# No. 13-7011

Oral Argument Requested

# In the United States Court of Appeals for the District of Columbia Circuit

————————

PHILIP S. MORALES, ET. AL,

*Appellants*,

v.

INTELSAT GLOBAL SERVICE CORP., ET. AL,

*Appellees*.

————————

**On Appeal From The United States District Court For The District of Columbia**

————————

**BRIEF OF APPELLANTS**

————————

LAWRENCE P. POSTOL, ESQ.
SEYFARTH SHAW, L.L.P.
975 F Street, N.W.
Washington, DC 20004-1454
Direct: 202-828-5385
Email: Lpostol@seyfarth.com

Attorneys for Appellants

Dated: June 19, 2013

CERTIFICATE TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), counsel for Appellants provide the following information as to parties, rulings, and related cases:

**A.    Parties and Amici.**

Appellants in this case are Tuna Alper, Samir Dajani, John and Valda Hampton, Bengt and Monalisa Pettersson, James Redpath, Peter Roach, and Frank Subaran, who were plaintiffs below.

Appellees are Intelsat Global Services Corporations which is now Intelsat Global Service, LLC, Intelsat, Ltd., which is now Intelsat S.A., and Defendant Intelsat Corporation in place of Kathleen Alexander, who were defendants below.

**B.    Ruling Under Review.**

The December 27, 2012 order at the District Court, and to the extent it is incorporated into that order, the District Court's August 22, 2012 order (App. at 605-610 and 666-689).

**C.    Related Cases.**

This case arises from a September 26, 2007 Consent Order in the District Court, 1:04-cv-D144-JR (App. at 562-567).

# TABLE OF CONTENTS

Page

CERTIFICATE TO PARTIES, RULINGS, AND RELATED CASES ...................1

STATEMENT OF JURISDICTION.................................................................3

STATEMENT OF ISSUES .............................................................................3

STATEMENT OF THE CASE..........................................................................3

STATEMENT OF FACTS ...............................................................................3

      A.    District Court Decision.....................................................................10

SUMMARY OF THE ARGUMENT ................................................................12

ARGUMENT ...................................................................................................15

I.      STANDARD OF REVIEW ...................................................................15

II.     THE LACK OF CLEAR NOTICE, AS ERISA REQUIRES,
        INVALIDATES INTELSAT'S ACTION OF REQUIRING
        RETIREES TO PURCHASE MEDICARE COVERAGE.
        MOREOVER THE REQUIREMENT WAS NEVER
        CONTEMPLATED BY THE 2007 SETTLEMENT...................................15

ORAL ARGUMENT REQUEST ......................................................................25

CONCLUSION .................................................................................................25

15384131v.2 / 31141-000001

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

CASES

\*<u>Cigna Corp. v. Amara,</u>
  __ U.S. __, 131 S.Ct. 1866, L.E.2d 843 (2011)............................................14, 15

\*<u>Corley v. Hecht Company,</u>
  530 F. Supp. 1155 (U.S.D.C. 1982)...............................................................21

<u>Estate of Coll-Monge v. Inner Peace Movement,</u>
  524 F.3d 1341 (D.C. Cir. 2008).........................................................14

\*<u>Germany v. Operating Engineers Trust Fund of Washington,</u>
  789 F. Supp. 1165 (U.S.D.C. 1992).................................................21

<u>Maxa v. John Alden Life Insurance,</u>
  972 F.2d 980 (8th Cir. 1992)..........................................................23

\*<u>McCravy v. Metropolitan Life Ins. Co.,</u>
  690 F.3d 176 (4th Cir. 2012)...................................................15, 22

<u>McCready v. Nicholson,</u>
  465 F.3d 1 (D.C. Cir. 2006)...............................................................15

\*<u>Whiteman v. Graphic Communications Int'l Union,</u>
  871 F. Supp. 465 (U.S.D.C. 1994)...................................................21

STATUTES

28 U.S.C. § 1291 ........................................................................................3

29 U.S.C. § 1022(a) ..........................................................................13,15, 21

29 U.S.C. § 1132(a)(1) and (a)(3).................................................................15

OTHER AUTHORITIES

29 C.F.R. §2520.102-2(b) ......................................................................16, 22

29 C.F.R. § 2520.102-3(k).........................................................................22

29 C.F.R. § 2520.103(k)(1).......................................................................16

Fed. R. Civ. P. 56(c)..................................................................................15

**\* Cases primarily relied upon.**

## GLOSSARY

"ERISA" is Employee Retirement Income Security Act.

"SPD" is Summary Plan Description.

15384131v.2 / 31141-000001

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Phillip S. Morales, et al., | ) | |
| | ) | |
| Appellants, | ) | |
| | ) | No. 13-7011 |
| v. | ) | |
| | ) | |
| Intelsat Global Service Corp., et al., | ) | |
| | ) | |
| Appellees. | ) | |

## BRIEF OF APPELLANTS

Appellants[1] respectfully submit this brief in support of their appeal of the

Order of the District Court, which refused to reform the 2007 Consent Order over

which the District Court retained jurisdiction, or otherwise take action against

Appellees' interpretation of an ERISA plan, which clearly violates ERISA's

disclosure rules.  The 2007 Consent Order[2] provided Appellant retirees with vested

retiree health benefits provided by their former employer, Appellees.  Starting in

2011, the Appellees (collectively referred to as "Intelsat")[3] required Appellants

---

[1] Appellants are Tuna Alper, Samir Dajani, John and Valda Hampton, Bengt and Monalisa Pettersson, James Redpath, Peter Roach, and Frank Subaran.

[2] Judge Robertson entered the Consent Order.  He retired, and then Judge Kessler was assigned the case and ruled on the motion at issue.

[3] Defendants, in their June 12, 2012 filing in footnote 1, indicated Defendant Intelsat Global Services Corporation is now Intelsat Global Service, LLC, Defendant Intelsat, Ltd. is now Intelsat S.A., and the plan administrator is now Defendant Intelsat Corporation in place of Kathleen Alexander.  The Plaintiffs

(collectively referred to as "Appellant Retirees") to purchase Medicare coverage, in order to benefit from the vested health benefits provided for by the Consent Order. Unlike the vast majority of retirees under the plan and Consent Order, Appellant Retirees do not qualify for free Medicare Part A. The cost to most of the Appellant Retirees of Medicare Part A is $450 per month per person, so $900 a month for a husband and wife. In addition, there are penalties for signing up for Medicare late. This is a tremendous added burden, since in comparison, the plan premium is only $56.27 a month, plus COLA's, per person (App. at 57).

Because the Summary Plan Description ("SPD"), which is also the plan document, contains no such requirement for purchasing Medicare (as opposed to merely signing up for free Medicare Part A), the Appellant Retirees challenged Intelsat's interpretation of the SPD as being in violation of ERISA Section 102(a) – a major limitation, the requirement to purchase Medicare Part A, is not clearly identified in the SPD. The Plaintiffs requested the Court, pursuant to ERISA 502(a)(3), to reform the Plan so as not to require Appellant Retirees to have to purchase Medicare, or otherwise to prevent the Appellees' interpretation of the plan to require Appellant Retirees to purchase Medicare coverage.

---

have no objection to the Defendants' names being corrected in the lawsuit to reflect these changes.

The District Court refused to even consider the Appellants' evidence, mistakenly believing the Court's ruling on a motion to hold Appellees in contempt, decided the Section 102(a) issue. Thus, the District Court did not even attempt to apply the standard required by Section 102(a) -- would the average plan participant have understood the limitation the plan is imposing by reading the SPD. Nor did the Court consider the affidavit evidence attached to the motion.

## STATEMENT OF JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

Did the District Court err in denying Appellant Retirees' motion to reform, or otherwise to grant relief for Intelsat's breach of ERISA section 102(a), by requiring Appellant Retirees to purchase Medicare coverage in order to benefit from their vested health benefit plan.

## STATEMENT OF THE CASE

This case is an appeal of the District Court's orders of August 22, 2012 and December 27, 2012.

## STATEMENT OF FACTS

This is a classic case of corporate greed. Intelsat was a treaty organization which put satellites into space for communications by various countries, including the United States. The company was built on the hard work of its employees,

15384131v.2 / 31141-000001

many of whom came to the United States to develop the satellite system which aided more than 100 countries. When Intelsat was privatized as a private corporation in 2001, it promised, in writing, to continue vested health benefits for its retirees (App. at 483).

Intelsat was subsequently purchased, however, by private equity interests who soon tried to renege on the written promise, claiming the written promise was not enforceable since it was not put in the private corporation's corporate papers during the transition. A lawsuit ensued and a Consent Order was entered in 2007, providing vested health benefits, albeit not quite as good as had originally been promised – slightly higher premiums and higher co-pays.

While the retirees were given charts from Intelsat showing the increased cost to them by the settlement, they were not given any notice that retirees would have to purchase Medicare coverage. To the contrary, it was clear the parties understood that only those who worked 10 years paying Medicare taxes would have to simply sign up for free Medicare Part A. Appellant Retirees only worked for Intelsat when it was a treaty organization, and thus they did not pay Medicare taxes and thus are not entitled to free Medicare coverage.

Now, yet another private equity firm has purchased Intelsat, and they are trying to cheat the retirees ever further, by requiring the few who do not have free Medicare Part A to have to purchase it at a considerable cost of $450 per month

4

per person.  The plan documents do not state that Medicare coverage must be

purchased by plan participants.  Instead, it states that those who are "entitled" to

Medicare must sign up for it (App. at 170 and 183).  The plan participants

understood that this required those entitled to free Medicare to sign up for it.  No

one understood this to require plan participants who had not earned the right to free

Medicare (paying Medicare taxes for 10 years) to have to purchase Medicare

coverage.  Indeed, even Intelsat did not have that understanding, since Intelsat did

not require Appellant Retirees to purchase Medicare coverage for the first four

years of the Consent Decree.  Likewise, Medicare wrote at least one of the

Appellant Retirees who inquired, that he was NOT "entitled" for Medicare.

There is ample evidence that neither party intended for Appellant Retirees to

have to purchase Medicare in order to benefit from the health benefit plan.  In

Plaintiff's 2007 Memorandum in Support of the Settlement/Consent Decree, it was

noted that the G-4 retirees (those without Medicare), needed the settlement because

they do not have Medicare benefits:

> At all times, counsel Mr. Postol has been aware
> that the G-4's and permanent residents do not have
> Medicare coverage, and thus assuring benefits for them is
> very important.  However, that is all the more reason they
> should favor the settlement, because if the case is lost,
> they are totally without medical coverage.  Indeed, those
> G-4's and permanent residents who have accepted the
> fact that there is a chance Intelsat could win the lawsuit,
> are in favor of the settlement.

5

> In terms of class status, the evidence and legal issues for the G-4's and permanent residents is absolutely the same as for everyone else, and indeed, no one has suggested otherwise.  <u>The only different is the impact of an adverse judgment or the bankruptcy of Intelsat would indeed affect the G-4's and permanent residents more severely than those retirees who are already on Medicare, since those on Medicare would at least have some medical health care coverage through Medicare.</u>

App. at 494 (emphasis added).

At the 2007 Fairness Hearing to consider the proposed settlement, one of the retirees without Medicare raised his concern that Intelsat might go bankrupt, and thus he argued moneys should be placed in trust to fund the vest health benefits, since if Intelsat went bankrupt, he would have no health insurance since he was not eligible for Medicare:

> He maintains this posture in spite of the glaring fact to which he admits that the so-called <u>G-4s and permanent residents would be left with no insurance at all in the event of Intelsat's bankruptcy.</u>
>
> On the one hand, <u>U.S. citizens are very well protected in the event of bankruptcy, as they would be eligible at the age of 65 for U.S. Medicare</u>, which Intelsat in it bountiness has already paid for.
>
> <u>On the other hand, the G-4s and permanent residents would be left with no insurance at all, and I'm one of them</u>.  Left with nothing.  Zero.  Lead counsel cannot have it both ways.  Both groups cannot be treated equally but at the same time unequally.  This is magic.
>
> Intelsat has reached again to another private equity group call B.C. Partners.  We have mentioned this before.  The sale will add another $3.85 billion to Intelsat's existing

6

> $11 billion debt, driving Intelsat even closer to the brink
> of insolvency.
>
> Accordingly, and this is not my say so, but Intelsat's
> investment rating has now been further downgraded to
> junk bond status by the SNP.

App. at 545 (emphasis added).

The exchange of counsel, immediately after this issue was raised, made it clear that the parties understood the term "Medicare eligible" to be those who were entitled to free Medicare -- those who worked and paid Medicare taxes for 40 quarters, or were married to someone on Medicare.  Intelsat's counsel noted the retirees could buy Medicare coverage IF Intelsat went bankrupt, making clear no one expected them to have already purchased Medicare simply to get the Intelsat health benefits:

> MR. POSTOL:  Your Honor, when this all came up after
> the settlement, I asked Intelsat that very question
> thinking, gee, if it is five or ten people, maybe we could
> work something out.
>
> I must say that unlike you I was not thinking about taking
> it from the other plaintiffs.  I was thinking they would
> just give more money.  But it turns out that there is 146, I
> think if I have the number right, but we don't know --
> some of them may actually be Medicare eligible
> depending on if they married somebody, if they worked
> forty quarters.
>
> MR. WEBB:  Well, I have got the numbers.
>
> MR. POSTOL:  Okay.

> MR. WEBB:  It is 158 people that were G-4s when they retired from Intelsat.  But as you heard today, Your Honor, a number of people retired from Intelsat in 1994, 1995, long before any of these events.
>
> And in terms of Medicare eligibility, Your Honor, the question is really a dollars question.  If you don't have 40 quarters you still can be eligible for Medicare.  You may simply have to pay something for part A that someone who has worked for 40 quarters would not have to pay.
>
> <u>So if you retired in 1994 from Intelsat and went to work, as many of these people did, for another company had worked 40 companies (sic) for that other company, you would be eligible for Medicare</u>.  And we have no information as to what happened to the 158 G-4s after they retired from Intelsat.
>
> We also know that of the 158 some 33 are living outside of the United States in 15 countries, and of those 15 countries, 10 countries provide universal healthcare. There are something like five to seven --

App. at 553-554 (emphasis added).

Lastly, the affidavits of the Appellant Retirees are clear none of them understood they would have to purchase Medicare and indeed, Intelsat for four years had the same understanding, since it did not require them to purchase Medicare coverage.  John Hampton's affidavit is illustrative:

> 2.      When I worked at Intelsat, I had a G-4 Visa status.  As such, neither I nor Intelsat paid Social Security nor Medicare taxes for me, and thus I always understood I was not eligible for nor entitled to Medicare.

8

3.      I am 78 years old (date of birth of 9/30/33), and I was unaware that I could purchase Medicare until 2012.

4.      Before the Fairness Hearing in this case, <u>Intelsat did not indicate to me that I would have to purchase Medicare coverage.  To the contrary, it was my understanding only those entitled to Medicare through having paid the required Social Security and Medicare taxes for the required time period would have to sign up for Medicare.</u>  I understood those who paid the required tax obtained free Medicare for the hospitalization, and they paid some small amount for Medicare coverage of doctors' care.  It was my understanding I could not sign up for any Medicare benefits, because I had not paid into the Social Security and Medicare systems.

5.      I did not understand the Intelsat plan to require me to enroll in Medicare.  I understood only those who paid the Social Security and Medicare tax and thus were entitled to free Medicare Part A could enroll in Medicare, and thus I understood the Intelsat plan to only require those entitled to free Medicare Part A, and not me, to enroll in Medicare.

6.      Indeed, up until 2012, Intelsat did not require that I purchase Medicare coverage, and never told me I had to purchase Medicare.  From 2007 until February, 2012, Intelsat paid my benefits under the Intelsat Health Benefit Plan as the primary health insurer, and only in February, 2012, for the first time, did Intelsat inform me that I had to purchase Medicare.  I was informed of the requirement by the attached February 2, 2012 letter from Intelsat.

7.      While I signed up for Medicare after I received Intelsat's letter, because I did not sign up for Medicare at age 65, I must pay a penalty of $105.00 a month for myself and $155.00 a month penalty for my wife.  Thus, the annual cost of Medicare for myself and my wife is $16,341.00, of which $3,120.00 is a penalty.

9

App. at 628-69 (emphasis added).

One Appellant Retiree wrote Medicare and they informed him he was <u>NOT</u> "entitled" to Medicare, reflecting that even Medicare viewed "entitled" as meaning obtaining free Medicare part A:

> The above individual is not receiving any type of Social Security benefits or Medicare.  <u>He is not entitled to either benefits at this time</u>.  There is no application pending for any benefit with the Social Security Administration as of 02/08/2012.

App. at 624 (emphasis added).

The Affidavits of Retirees Frank Subaran, John Hampton, Peter Roach, Tuna Alper, Samir Dajani, and Bengt Pettersson (App. at 622-665), establish that none of them understood the Intelsat Plan to require that they purchase Medicare, and that for most of them, neither did Intelsat, who for over four years Intelsat did not require they purchase Medicare coverage.

A.      <u>District Court Decision</u>

The District Court, in an August 22, 2012 order, denied Appellants' motion to hold Intelsat in contempt, finding that Appellants did not show by "clear and convincing evidence" that Intelsat's actions violated a clear and unambiguous provision of the Consent Agreement (App. at 605-610).

The District Court, in its December 27, 2012 order, used the same reasoning to deny the motion to reform, failing to address the Appellant Retirees' evidence,

and the fact it is a totally different standard – the contempt motion required

Appellant's Retirees to show by clear and convincing evidence that Intelsat

violated a clear unambiguous provision in the Consent Order; the motion to reform

merely requires Appellant Retirees to show the ERISA SPD did not clearly

identify a plan limitation, as viewed by the average plan participant:

> Once again, Plaintiffs are arguing that the Summary Plan Description lacked proper clear notice informing Plan participants that they might have to purchase Medicare Part A benefits, thereby violating ERISA. Basically Plaintiffs are again objecting the Plan's "coordination of benefits" provision.

> In its Memorandum Order of August 22, 2012, this Court ruled that the provisions at issue "clearly state that the Plan will reduce the benefits for 'Persons who are eligible for Medicare…'" The second paragraph also advises that the employee "should enroll for and maintain coverage under both Medicare Parts A and B" (emphasis in original). Mem. Order at 3. Given that ruling, as well as the rejection of Plaintiffs argument that the term "entitled" was ambiguous, the Court concluded that there was no lack of proper clear notice, which ERISA of course requires, and, therefore, there was no basis for finding, under ERISA § 502(a)(3), reason to reform the Plan in order to stop Defendants from requiring Plaintiffs to purchase Medicare Part A. Defendants are correct that the present Motion seeks the same remedy as the earlier Motion did although offering a slightly different claim for relief. Just as the Court found in the earlier Motion that "Plaintiffs are essentially trying to write additional language into the Plan that might have been desired but simply is not there," Mem. Op. at 5, they are doing the same in their present Motion.

11

In the alternative, Plaintiffs argue that the Defendants' Plan Administrator abused her discretion and acted arbitrarily and capriciously by requiring all Plan members who were "eligible for or enrolled in Medicare" to pay for coverage under Medicare Part A. As is well established "deference is paid to the decision of the Plan Administrator and her decision [must] stand so long as it is not unreasonable, arbitrary, or capricious, and so long as the Plan's language "reasonably supports" that interpretation. Black v. Pitney Bowes, Inc., 942 F.3d 1450, 1453 (D.C. Cir. 1992). Mem. Op. at 5-6. In any event, this Court is not the proper forum in which to adjudicate Plaintiffs' denial of benefits claims under ERISA § 502(a)(1)(B). Under that section of the statute, ERISA Plan participants must first exhaust their administrative remedy and then initiate an action in federal court. Plaintiffs ask that they be given this option. The Court sees no merit in adopting this suggestion. This case focuses on a settlement plan that affects a large group of more than 600 Plan participants. There is no reason to merge the two very separate groups by allowing Plaintiffs to pursue their individual claims in this lawsuit.

App. at 667-668.

## SUMMARY OF THE ARGUMENT

Intelsat agreed to a Consent Order in 2007 which incorporated and adopted the SPD's for several health plans, which SPD's were also the plan documents. Appellant Retirees were ordered to receive vested health care benefits, at a nominal cost, $56 a month per person. In 2012 Intelsat changed its interpretation of the plans and SPD's to require Appellant Retirees to purchase Medicare coverage at a

15384131v.2 / 31141-000001

cost of $900 per month per couple, plus Medicare penalties for late sign up (which for one retiree couple added an additional $250 per month).

The SPD required retirees who are "entitled" to Medicare to sign up for Medicare (App. at 107). The evidence Appellant Retirees submitted showed that everyone understood that to mean those who were entitled to free Medicare by paying Medicare taxes for 10 years. No one understood it to mean those without Medicare coverage had to purchase it, thus raising their cost from $112 a month for a couple, to, in one case $1,150 a month. This reading was understood because none of the Appellant Retirees had purchased Medicare under the former Intelsat plan, and indeed, they did not even know Medicare coverage could be purchased.

Intelsat held meetings with the retirees to get them to agree to the settlement, giving them cost charts, and there was no mention of them having to pay for Medicare. The District Court held a Fairness Hearing, and again, there was no mention of the requirement to purchase Medicare coverage. Indeed, the comments made clear that the Appellant Retirees would not have Medicare coverage and thus if Intelsat went bankrupt, they would have nothing (although it was noted that if Intelsat went bankrupt, they could _then_ purchase Medicare). Indeed, this was Intelsat's understanding since for four years, Intelsat did _not_ require the Appellant Retirees to purchase Medicare.

13

Clearly the SPD does not meet the requirements of ERISA section 102(a), 29 U.S.C. § 1022(a), which requires any limitation be clearly disclosed.  Intelsat could have easily stated those without Medicare would have to purchase it, but Intelsat did not do so, since Intelsat knew the retirees would then not have agreed to the settlement.

The Supreme Court in <u>Cigna Corp. v. Amara</u>, __ U.S. __, 131 S.Ct. 1866, 179 L.E.2d 843 (2011) made clear this is precisely the kind of situation that courts can correct with their equity powers.  Unfortunately, the District Court below did not even analyze the issue under section 102, and never asked the question what the average plan participant understood.  The District Court never looked at the Appellants Retirees' affidavit evidence.  Possibly this was because the Appellant Retirees first tried to hurdle a tougher standard, holding Intelsat in contempt, and possibly it was because the District Court Judge felt uncomfortable with the issue, since she had not issued the original Consent Order.

A wrong has clearly been done here, and the ERISA requirements have been violated.  Appellant Retirees are entitled to have the wrong corrected.  ERISA was enacted to protect employees' rights, and Appellant Retirees ask for that protection in the face of a clear ERISA violation.

14

ARGUMENT

## I.     STANDARD OF REVIEW

The District Court decisions were essentially grants of motions for summary

decision, since no hearing in which evidence was taken was allowed.  This Court

reviews the grant of summary judgment *de novo*, applying the same standard of

review as that of the district court.  <u>Estate of Coll-Monge v. Inner Peace</u>

<u>Movement</u>, 524 F.3d 1341, 1346 (D.C. Cir. 2008).  Summary judgment is

appropriate only where "there is no genuine issue as to any material fact" and,

viewing the evidence in the light most favorable to the nonmoving party, "the

moving party is entitled to a judgment as a matter of law."  <u>McCready v.</u>

<u>Nicholson</u>, 465 F.3d 1, 7 (D.C. Cir. 2006) (quoting Fed. R. Civ. P. 56(c)).

## II.    THE LACK OF CLEAR NOTICE, AS ERISA REQUIRES, INVALIDATES INTELSAT'S ACTION OF REQUIRING RETIREES TO PURCHASE MEDICARE COVERAGE.  MOREOVER THE REQUIREMENT WAS NEVER CONTEMPLATED BY THE 2007 SETTLEMENT

The Retirees seek relief under both ERISA sections 502(a)(1) and 502(a)(3),

29 U.S.C. § 1132(a)(1) and (a)(3).  Pursuant to <u>Cigna Corp. v. Amara</u>, __ U.S. __,

131 S.Ct. 1866, 179 L.E.2d 843 (2011), the Appellant Retirees asked that the

Intelsat Healthcare Plan for the Retirees be reformed to make clear that Retirees

are not required to purchase Medicare, and that the Intelsat Plan remains as the

primary healthcare insurer for the Appellant Retirees.  Under <u>Amara</u>, the district

15

courts have available the full array of equitable remedies for misleading actions by

a plan and its fiduciary, as well as mistakes.  McCravy v. Metropolitan Life Ins.

Co., 690 F.3d 176 (4th Cir. 2012)(reversing the district court).

ERISA requires a Summary Plan Description ("SPD") to be "written in a

manner calculated to be understood by the average plan participant, and shall be

sufficiently accurate and comprehensive to reasonably apprise such participants

and beneficiaries of their rights and obligations under the plan."  29 U.S.C.

§ 1022(a).  In this case, the Plan documents were also the Summary Plan

Descriptions, and were titled as such and attached to the Consent Decree.  *See*, *e.g.*,

Exhibit A-14 to agreement of settlement, "Summary Plan Description Choice Plan

for Intelsat Corporation."  (App. at 39, 103, 225, 372).  ERISA regulations require

that the SPD "must not have the effect to misleading, misinforming or failing to

inform participants and beneficiaries," 29 C.F.R. §2520.102-2(b), and it must

contain "a statement clearly identifying circumstances which may result in

disqualification, ineligibility or denial, loss, forfeiture, suspension, offset or

reduction … of any benefits that a participant or beneficiary might otherwise

reasonably expect the plan to provide…."  29 C.F.R. § 2520.103(k)(1) (emphasis

added).

The Intelsat SPD does not clearly state the Retirees have to purchase

Medicare coverage or lose entitlement to the benefits under the Intelsat Health

16

Benefit Plan, and an average participant, reading the SPD, would not understand that. Indeed, for four years, that was not Intelsat's interpretation of the Plan for the Appellant Retirees. The Affidavits of Retirees Frank Subaran, John Hampton, Peter Roach, Tuna Alper, Samir Dajani, and Bengt Pettersson (App. at 622-665), establish that none of them understood the Intelsat Plan to require that they purchase Medicare coverage, and that for most of them, neither did Intelsat, who for over four years did not require they purchase Medicare coverage. Also instructive is the letter from Medicare attached to Mr. Subaran's Affidavit, in which Medicare did not believe Mr. Subaran was "entitled" to Medicare, because he had not paid into Social Security for 40 quarters and thus was not entitled to free Medicare Part A (App. at 624).

As the affidavits of the Appellant Retirees establish, the intent of the Plan was not to require Appellant Retirees to purchase Medicare Part A, and this was never considered by the parties in the discussions leading up to the Consent Decree, nor at the Fairness Hearing before Judge Robertson. To the contrary, as part of the settlement negotiations, Intelsat provided a chart showing the added costs to the Retirees in changing to this Plan, and the significant cost of purchasing Medicare coverage was never shown on the chart, or otherwise conveyed to the Retirees.

17

It would have been very simple for the SPD to say that persons who are not entitled to free Medicare Part A, have to purchase Medicare Part A, in order to receive the benefits under the Health Benefit Plan. If the object of the SPD is to inform the average participant as to what is required of them, and not to mislead them (and that is exactly what ERISA requires), then Intelsat should have said exactly that in the SPD, if that was Intelsat's intent. Not only is that what justice requires, that is what ERISA requires.

Intelsat knew, or should have known, that none of the Appellant Retirees had ever purchased Medicare Part A. Intelsat knew, or should have known, that the average Plan participants would not even know that Medicare Part A could be purchased. There was never any discussion in the settlement talks as to any retiree having to purchase Medicare Part A. This is a significant omission, since the cost of Medicare Part A is far greater than any other costs the Plans require.

While at the Fairness hearing, a few Plan participants heard Intelsat's counsel make a fleeting reference that Medicare Part A could be purchased (App. at 554), that was only in response to concerns over Intelsat going bankrupt. The reference was that if Intelsat went bankrupt, then at that time retirees who did not have Medicare Part A could purchase Medicare Part A as a substitute for the Plan benefits. There was no suggestion of any kind that the retirees had to purchase Medicare Part A in order to benefit from the Plan. To the contrary, the statement

18

was the participants could purchase Medicare Part A if and when Intelsat went

bankrupt, and thus obtain Medicare in place of the Plan benefits.  The clear

implication was that unless and until Intelsat went bankrupt, the Retirees did not

have to purchase Medicare Part A.  There was not even a suggestion they would

have to purchase Medicare Part A before such a bankruptcy, which was a remote

and unlikely event.

　　　One can only assume Intelsat's counsel did not make such a statement that

the retirees would have to purchase Medicare Part A even without a bankruptcy,

because he knew that the G-4[4] retirees would have strenuously objected.  Again, if

the Court was to judge the fairness of the settlement, and if the Plan was to meet

the requirement of ERISA that any limitations be clear, then Intelsat had an

obligation to state to the Court, and in the SPD, that Intelsat was going to interpret

the Plan to require the G-4 retirees to purchase Medicare coverage.

　　　The District Court also noted that the word "entitled" could not mean only

persons who can obtain Medicare Part A for free, because Appellant Retirees

concede that if they obtained Medicare Part A for free, they would have to

purchase Medicare Part B.  There are two easy responses to that argument.  First,

ERISA requires that a SPD be clear and easy to understand.  Thus, Intelsat should

---

[4] G-4 retirees are resident aliens who worked for Intelsat, which was then a treaty
organization, and thus did not pay into Medicare or Social Security.

19

have put in the SPD that all participants have to purchase Medicare Part B as well, since without that, the SPD is not clear.  The fact that Retirees are not arguing over the lack of language referring to the need to purchase of Medicare Part B, does not make the language any clearer as to the unsaid requirement that they purchase Medicare Part A.  Second, the language is judged by the understanding of the average plan participant.  The average plan participant knew that if you had free Medicare Part A, they had to purchase Part B (and indeed, Intelsat charged a lower premium for those who purchase Part B).  None knew they had to purchase Medicare Part A, since that had not been Intelsat's practice to require that.

Intelsat, in opposing Retiree's motion to hold them in contempt, argued that the Plan document was ambiguous as to whether Retirees had to purchase Medicare Part A.  That is an admission that the SPD violates ERISA section 102(a).  While we can argue over whether the term "entitled" can fairly be interpreted to require one to purchase Medicare, as opposed to referring to those who obtain it for free (the interpretation Medicare takes, see letter attached to Subaran Affidavit attached hereto, App. at 627), there can be no argument the plan provision did not clearly put Appellant Retirees on notice they had to purchase Medicare.  As Intelsat emphasized in opposing Appellant Retirees' contempt motion, the prior plan coordination provision did not require retirees to purchase

20

Medicare Part A.  Thus, if the new coordination provision had such a requirement, it should have been clearly stated.

As the Appellant Retirees' Affidavits demonstrate, the average plan participant did not even know he/she could purchase Medicare Part A, let alone that the new Intelsat Plan required them to purchase Medicare coverage if they did not have free Medicare Part A coverage.

In <u>Corley v. Hecht Company</u>, 530 F. Supp. 1155 (U.S.D.C. 1982), a plan used dividends from a group life insurance plan to recoup voluntary contributions the employer owed the plan.  The Court held the failure to disclose that practice in the plan document violated ERISA section 102(a), the duty to provide a summary plan description which is "written in a manner calculated to be understood by the average plan participant and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan."  29 U.S.C. § 1022(a).  The Court used its equitable power in that case to prohibit the practice.

Likewise, in <u>Germany v. Operating Engineers Trust Fund of Washington</u>, 789 F. Supp. 1165 (U.S.D.C. 1992), the Court refused to apply an interpretation of a plan provision which had not been clearly stated in the SPD.  In a similar case, in noting the failure to give the required ERISA notice, the Court in <u>Whiteman v. Graphic Communications Int'l Union</u>, 871 F. Supp. 465 (U.S.D.C. 1994) observed,

21

"The Court does not understand why the SPD simply did not include the two year disability cut-off period in is discrepancies".  The same can be said for why Intelsat did not simply say Plan participants who did not have free Medicare Part A, would have to now purchase it, unlike what had occurred under the prior health care plan.

The ERISA regulations make clear that if there is a limitation on benefits, that limitation must be clearly stated in the SPD:

> The format of the summary plan description must not have the effect to misleading, misinforming or failing to inform participants and beneficiaries.  Any description of exception, limitations, reductions, and other restrictions of plan benefits <u>shall not be minimized, rendered obscure or otherwise made to appear unimportant</u>.

29 C.F.R. § 2520.102-2(b) (emphasis added).

> For both pension and welfare benefit plans, <u>a statement clearly identifying circumstances which may result in disqualification, ineligibility, or denial, loss, forfeiture</u>, suspension, offset, reduction, or recovery (e.g., by exercise of subrogation or reimbursement rights) of any benefits that a participant or beneficiary might otherwise reasonably expect the plan to provide on the basis of the description of benefits required by paragraphs (j) and (k) of this section.

29 C.F.R. § 2520.102-3(k)

Telling retirees they have to enroll in Medicare is not the same as saying they have to purchase Medicare Part A, particularly when, previously, the only ones required to enroll in Medicare had been those entitled to free Medicare Part A.

22

Likewise, the Courts have used equity estoppel when a SPD fails to give adequate notice to plan benefits of a plan requirement.  <u>McCrary v. Metropolitan Life Insurance Co.</u>, 690 F.3d 176 (4th Cir. 7/5/12).

The incontrovertible fact is that it would have been simple enough for Intelsat to state in the SPD that if one is eligible to purchase Medicare Part A, they must do so.  When the vast majority of class members have Medicare Part A for free, if there was a requirement that those who do not have it for free have to purchase it, then that simple fact should have been stated.  Intelsat has not shown that the average plan participant should have understood that they had to purchase Medicare Part A.  Indeed, they have not shown even one participant who understood that.

What Intelsat seems to argue is that Retirees and their counsel were just too stupid to have realized the trick Intelsat was playing on the G-4's by requiring them to purchase Medicare Part A, without saying so in the documents, and that there is no remedy for that.  That, however, is not the standard under ERISA.  To the contrary, the standard is that the SPD must clearly state any exclusion and limitation, precisely to prevent participants from being misled or tricked.  Indeed, the Defendants below strangely cite to the case of <u>Maxa v. John Alden Life Insurance</u>, 972 F.2d 980 (8th Cir. 1992).  In that case, the Court had before it a Medicare coordination provision similar to the one at issue herein, and the Court of

23

Appeals noted, "this Court, like the trial court, doubts whether the summary plan description meets the requirement of ERISA and its attendant regulations" (citing to the same notice requirements Retirees rely upon herein). Id. at 984. The plaintiff in that case lost because he did not establish he relied on the plan's misleading language to his detriment; he failed to show why he did not apply for Medicare (it appears he would not have even had to pay for Part A). Here, the Retirees' affidavits clearly show such detrimental reliance. Moreover, the Retirees herein are not even asking for damages due to their reliance (unpaid medical bills), but rather are asking that Intelsat be precluded from enforcing an exclusion and limitation.

Finally, Intelsat relies upon the fact the new health benefits plan replaced the old plan, and was thoroughly negotiated. The test, however, is whether the "average plan participant" would have understood the exclusion or limitation, and when judging that issue, one cannot remove from the participants' minds their past experience under the old plan. Precisely because the new plan requires participants to purchase Medicare Part A (according to Intelsat), and the old plan did not, that change should have been made clear to the Retirees. This is especially the case when as part of the negotiations for the settlement and new plan, Intelsat gave documents to the Participants which highlighted the differences in the costs under the old and new plan, and the requirement that the Medicare Part A be purchased

24

was never noted.  Again, one hates to beat a dead horse, but the test is what the average plan participant would understand, and the past history and the misleading information Intelsat gave the participants can certainly be taken into account.

So there is no mistake about it, Retirees note that when the new plan was negotiated, there was NEVER any discussion of any retiree having to purchase Medicare Part A.  Only at the Fairness Hearing, a few Participants heard Intelsat's counsel say that IF Intelsat went bankrupt, the G-4 participants could purchase Medicare Part A.  Intelsat counsel never said nor suggested they had to purchase Medicare Part A while Intelsat was solvent and paying benefits, and indeed, for four years they did not require it.

## ORAL ARGUMENT REQUEST

Appellants request oral argument.

## CONCLUSION

The Intelsat Plan clearly fails to meet ERISA' s notice requirement, and the remedy is to preclude the requirement that Appellant Retirees purchase Medicare, and to order that they be reimbursed for Medicare premiums they have paid to date.  The Consent Order should be so reformed.

Respectfully submitted,

PLAINTIFFS Tuna Alper, Samir Dajani,
John and Valda Hampton, Bengt and Monalisa
Pettersson, James Redpath, Peter Roach, and
Frank Subaran


By  /s/ Lawrence P. Postol

    Lawrence P. Postol, DC Bar No. 239277

SEYFARTH SHAW LLP
975 F Street, N.W.
Washington, DC 2004-1454
(202) 828-5385

Dated:  June 19, 2013

26

## **CERTIFICATE OF SERVICE**

I hereby certify that two copies of the foregoing BRIEF OF APPELLANTS

was served, via first class, postage prepaid, this 19th day of June, 2013 upon:

> Wayne A. Schrader, Esquire
> ISLER DARE RAY RADCLIFFE &
>     CONNOLLY, P.C.
> 1919 Gallows Road, Suite 320
> Tysons Corner
> Vienna, VA 22182-3964

　

　

>　　　　　 /s/ Lawrence P. Postol
>　　　　　　　　　Lawrence P. Postol

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

No.   13-7011    **Caption**:    Morales et al v. Intelsat Global Service Corp.

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**
Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed.R.App.P.
32(a)(7)(B) because:

☒    this brief contains 6,908 words, excluding the parts of the brief
exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

☐    this brief uses a monospaced typeface and contains _____
[*state the number* of] lines of text, excluding the parts of the
brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5)
and the type style requirements of Fed.R.App.P. 32(a)(6) because:

☒    this brief has been prepared in a proportionally spaced typeface
using Microsoft Word Version 2010 in Regular 14 point Times
New Roman type style*; or*

☐    this brief has been prepared in a monospaced typeface using
_____ [state name and version of
word processing program] with _____
_____ [state number of characters per inch
and name of type style].

/s/ Lawrence P. Postol_____

attorney for Appellants

Dated:  June 19, 2013

15384131v.2 / 31141-000001